## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:12-cv-01272-SRU

_____
                                          )
ERIC AHLQUIST, WAYNE ANDERSON,            )
JEREMY SOUZA, WILLIAM BENNETT,            )
RICHARD JAMES, EDWARD                     )
GIACOMAZZO, JR., MATTEO NACLERIO,         )
 on behalf of themselves                  )
and all others similarly situated,        )
                                          )
                          Plaintiffs,     )
                                          )
              v.                          )
                                          )
BIMBO FOODS BAKERIES DISTRIBUTION,        )
INC.,                                     )
                          Defendant.      )
_____  )

### PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL
### OF CLASS ACTION SETTLEMENT

Pursuant to Fed. R. Civ. P. 23, Plaintiffs seek preliminary certification of a class for

settlement purposes, preliminary approval of a proposed class settlement, appointment of class

counsel, and approval of a notice and claim form to be issued to class members.  A proposed

order is attached as Exhibit 1.

### Introduction

This action was brought on behalf of individuals who currently or formerly distributed

bread and other baked goods purchased from Defendant Bimbo Foods Bakeries Distribution, Inc.

or its affiliates (collectively, "BFBD") from depots in Connecticut and Massachusetts.  The

Plaintiffs challenge BFBD's allegedly unlawful misclassification of the distributors (known as

independent operators, or "IOs") as independent contractors instead of employees.  The

complaint includes claims under Massachusetts and Connecticut law, including counts under the

Massachusetts Independent Contractor Law, M.G.L. c. 149, § 148B (Count I), the Massachusetts

Payment of Wages Law, M.G.L. c. 149, § 148 (Count II), the Connecticut Independent

Contractor Law, Conn. Gen. Stat. § 31-222(a)(1)(B) (Count III), and the Connecticut Wage Law,

Conn. Gen. Stat. §§ 31-71e and 73 (Count IV).

Although BFBD disputes the allegations in the complaint and disputes that the action

could be certified as a class action for trial, the parties have engaged in extensive negotiations

over a period of almost two years and have reached an agreement to settle this action on a class-

wide basis.  A copy of the agreement is attached as Exhibit. 2.  The proposed settlement calls for

payment by BFBD of up to $3,525,000 and the establishment of procedures to help resolve

future disputes more efficiently and effectively.  For purposes of this proposed settlement,

Plaintiffs request that the settlement class be defined as all individuals who have purchased

products as IOs from depots in Connecticut or Massachusetts at any time from January 1, 2008, up

to the date that this Court grants preliminary approval of the proposed settlement.  Of the

approximately 433 individuals and business entities in this proposed class, about 324 are current

IOs and 109 are former IOs.

The Plaintiffs request preliminary approval of this settlement pursuant to Fed. R. Civ. P.

23(e).  As set forth in more detail below, the proposed settlement is a fair result for the class and

will allow the class to avoid the delay and uncertainty of protracted litigation.  The proposed

settlement is the result of extensive arms-length negotiations between the parties.  Throughout

these settlement discussions, the IOs were represented by Massachusetts and Connecticut

attorneys with extensive experience in class action and wage-and-hour litigation, and by a group

of IOs who hold leadership positions in the East Coast Bakery Distributors Association

("Association"), an association dedicated to advancing the interests of IOs.

Following initial review of the settlement by this Court, and upon the Court's approval, Plaintiffs' counsel propose to send a Notice and Claim Form ("Notice") to potential class members, a copy of which is attached as Exhibit 3. The Notice describes the claims and likely defenses, the negotiation process, the proposed settlement terms, the plan of distribution, and invites class members to submit claims for their share of the settlement proceeds. The Notice also informs class members of the final approval hearing and of their opportunity to voice any objections to terms of the settlement or to request exclusion from the settlement.

At the hearing on this motion, the parties will request that the Court schedule a final approval hearing.[1] In a motion for final approval and at the final approval hearing, Plaintiffs will report on the results of the notice process (i.e., the class members' response to the settlement, including the number of claims submitted and whether any class members have opted out of or objected to the settlement). Plaintiffs and BFBD also will request that the Court issue an order for final approval of the settlement so that settlement payments may be promptly distributed to class members, absent an appeal by an objector. Assuming Court approval of the settlement, the settlement proceeds will then be distributed to class members in accordance with the formula described below.

### History and Terms of Proposed Settlement

In the fall of 2010, a group of IOs began to explore the possibility of legal action against BFBD. At a preliminary meeting with Plaintiffs' counsel, dozens of IOs attended and expressed concerns consistent with various allegations that ultimately were advanced in the Complaint in this action. Following that meeting, over 40 IOs signed retainers and expressed their desire for

---

[1] Pursuant to the Class Action Fairness Act (CAFA), approximately one hundred (100) days must elapse between the date of the parties' filing of the settlement agreement with the Court and final approval of the settlement.

legal action.  Counsel for the IOs contacted BFBD regarding the IOs' concerns and their intent to file a complaint.  BFBD indicated a willingness to discuss the IOs' concerns and explore possible resolutions.  Later in 2010, the parties executed a tolling and confidentiality agreement to ensure that all rights were preserved and that there would be an opportunity for more frank and open discussions.

Beginning in early 2011 and continuing into the summer of 2012, the parties held a number of in-person and telephone meetings and discussions, including a meeting with all stakeholders in New York City, two day-long formal mediation sessions with nationally-recognized mediator Hunter Hughes (one in New York City and one in Boston), meetings in Hartford, and dozens of further communications about various settlement issues and positions. Throughout this process, the named plaintiffs played an active role in terms of identifying IO concerns and desired remedies.  Most significantly, IOs expressed a desire to remain independent but also wanted a more effective means for resolving disputes with BFBD.

There are three main components to the agreement reached by the parties.  The first two components are designed to provide a more effective mechanism for IOs to address issues with BFBD, and the third component is economic.  First, BFBD has agreed to implement a dispute resolution procedure.  See Exhibit 2 at C (BFBD/Independent Operator Voluntary Dispute Resolution Program).  Per that procedure, if an IO raises an issue that is not satisfactorily addressed, the IO can (but does not have to) initiate a mediation process with an independent, neutral mediator.  Generally, the IO will not have to pay any more than one-half of the mediator's fee or $1,000, whichever is less (and any such fees may be covered by the Association, as discussed below).

Second, for most disputes that are not resolved through mediation, the IO and BFBD

would be required to resolve the dispute through individual, binding arbitration.  See Exhibit 2 at

B (Arbitration).  An IO could choose to go straight to arbitration, without first going through the

voluntary mediation process.  Class and collective arbitrations would not be permitted based on

BFBD's concern that its justification for agreeing to settle the case would be undermined by a

new class action, but the same relief available in court would otherwise be available to an IO in

arbitration.  If arbitration is initiated, moreover, BFBD will be responsible for paying the

arbitrator's fees.  Although there are well-recognized pros and cons to proceeding in court versus

arbitration, arbitration is often faster and more efficient than a court proceeding, which almost

certainly will result in lower legal fees for individual IOs pursuing claims.

The third component is economic, requiring BFBD to make monetary payments totaling

$3,525,000.[2]  This portion of the agreement reflects the fact that IOs have possible claims for

damages against BFBD, and that they may demand compensation for releasing any such claims.

The Plaintiffs propose that each IO's share would vary, depending on three factors.  A redacted

spreadsheet showing the proposed minimum shares is attached as Exhibit 4.  First, current IOs

will receive substantially larger shares than former IOs.  This is because former IOs executed

releases when terminating their relationship with BFBD, so their ability to advance legal claims

is significantly comprised.  Second, IOs will receive proportionally larger shares based on the

scope of their business, as measured by revenue figures.  One theory of damages would look to

expenses that IOs were required to pay.  Plaintiffs believe that an IO's revenue should correlate

---

[2]      The proposed settlement provides for an award of attorneys' fees and costs of no more
than 25 percent of the settlement corpus, or $875,000.  The justification for this fee award is
discussed in more detail below, but the Court need not make a final determination on this award
until after a motion for final approval, at which time the Court can assess any objections to the
settlement, if any.

with expenses because it is likely that operating expenses increase as the amount of product being sold and delivered increases.  Third, IOs will receive proportionally larger shares based on the number of days during the relevant time frame (January 1, 2008 through August 1, 2012, when shares were calculated) that they operated their businesses.  This factor also relates to expenses, because there are fixed costs to daily operations, regardless of the amount of product that is being sold and delivered.  The minimum share for each former IO averages about $600.  The minimum share for each current IO averages about $7,400.  To the extent IOs do not participate in the settlement by submitting a claim form, the amount of their shares would be distributed pro rata to the IOs who elect to participate.[3]

The proposed settlement also includes a payment to the Association of $75,000 and additional payments to each named plaintiff, in the amount of $7,000.[4]  The payment to the Association is designed to give IOs as a group a stronger voice for advocating on behalf of IO interests and concerns.  The Association will play an active role in monitoring BFBD's compliance with the agreement, supporting IOs in the mediation and arbitration process, and continuing to advance the interests of IOs.

## Argument

**1.      The proposed settlement is fair, reasonable, and adequate.**

A class action may not be compromised without court approval, which requires the court to decide whether the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e).  This

---

[3]      To help ensure a meaningful settlement, the proposed agreement may be terminated, at the election of the Plaintiffs or BFBD, if more than 10 current or 10 former IOs fail to participate.

[4]      The justification for payments to the named plaintiffs is discussed below.

decision is committed to the district court's discretion.  Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1079 (2d Cir. 1998).

   In exercising its discretion, the Court should be guided by three general principles.  First, it is well-established that courts favor settlements over continued litigation.  Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir. 2005) (there is a "strong judicial policy in favor of settlements, particularly in the class action context") (internal quotation marks and citation omitted).  See also Herbert B. Newberg & Alba Conte, Newberg on Class Actions ("Newberg") (4th ed. 2002) § 11.41 ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

   Second, "courts should give proper deference to the private consensual decision of the parties," bearing in mind "the unique ability of class and defense counsel to assess the potential risks and rewards of litigation…."  Clark v. Ecolab, Inc., 2009 WL 6615729, *3 (S.D.N.Y. Nov. 27, 2009) (internal quotation marks omitted).  Deference to a privately negotiated settlement agreement is particularly appropriate where, as here, the settlement is the product of arms-length negotiations between the parties.  Wal-Mart Stores, 396 F.3d at 116; In re EVCI Career Colls. Holding Corp. Sec. Litig., 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007).

   Third, because the Plaintiffs seek only preliminary approval at this stage, the Court should examine whether there is cause "to submit the [settlement] to class members" and hold a later hearing "as to its fairness."  In re Traffic Executive Ass'n, 627 F.2d 631, 634 (2d Cir. 1980).  See also Newberg § 11.25 ("If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness…and appears to fall within the range of possible approval," the court should permit notice to issue.).  After the notice period, the Court will hold a further hearing in light of the class members' response to the notice.

7

Courts commonly consider a variety of factors when evaluating whether a settlement is fair, reasonable, and adequate, including the "negotiating process leading up to the settlement" and the substantive fairness of the settlement terms, which requires analysis of nine factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

McReynolds v. Richards-Cantave, 588 F.3d 790, 804 (2d Cir. 2009) (citations and internal quotation marks omitted), citing  of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974) (internal citations omitted).  To the extent these factors can be evaluated at this preliminary stage[5], they plainly favor approval of the proposed settlement.

In terms of the negotiating process leading up the settlement, the parties engaged in a lengthy, detailed process of evaluating potential claims and defenses, as well as discussing possible resolutions.  This process involved intensive involvement by IOs holding leadership positions in the Association and their counsel.  These IOs have years of experience as IOs, and their service as Board members demonstrates their commitment to advancing the interests of IOs as a group.

In addition to the presumption of fairness resulting from the process of arms-length negotiations in this case, the case satisfies the relevant criteria for substantive fairness.  First, litigation of this case would be a lengthy, complex, and expensive undertaking.  At its core, this case raises the question of whether IOs should be treated as employees under Massachusetts and

---

[5]      The second factor cannot be evaluated at the preliminary stage, because the class has not yet received notice of the proposed settlement.  It should be noted, however, that the proposed settlement includes a provision permitting any party to terminate the agreement if more than 10 current or 10 former IOs object or otherwise fail to submit a claim.

Connecticut law – a question on which there is a sharp disagreement between the parties.  Even

if Plaintiffs were correct that IOs should be treated as employees, which Defendant disputes,

Defendant still would have additional exemption and other defenses available to it under the

applicable statutes.  The parties almost certainly would be required to engage in extensive

discovery and briefing over questions of liability and defenses, the scope of discovery, the

appropriateness of class certification for trial, the measure of damages, and more.

  <u>Second</u>, although the parties have not conducted negotiations and discovery in the

context of a pending lawsuit, they have engaged in an equally lengthy, detailed, and intensive

process of evaluating potential claims and discussing possible resolutions.

  <u>Third</u>, the risks of establishing liability are substantial.  Perhaps most significantly, there

is an unresolved question about whether the state law misclassification claims would be

preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49

U.S.C. §§ 14501 et seq.  <u>See</u>, <u>e.g.</u>, <u>Mass. Delivery Ass'n v. Coakley</u>, 671 F.3d 33 (1st Cir. 2012)

(reversing dismissal of industry group's challenge to Massachusetts misclassification statute

based on preemption by FAAAA).   If the state laws are preempted, IOs may have no viable

claims for misclassification.[6]

  <u>Fourth</u>, even if IOs were found to have been misclassified, there is substantial uncertainty

about the proper measure of damages.  BFBD contends that the IOs would not be entitled to any

---

[6]  The FAAAA would not preempt claims under Fair Labor Standards Act ("FLSA"), 29
U.S.C. §§ 201 et seq.  For covered workers, the FLSA guarantees a minimum wage (of at least
$7.25 per hour) and overtime pay.  It does not appear, however, that any IO operating out of
Massachusetts or Connecticut has viable claims under the FLSA, which is why the complaint
alleges no federal claims.  The FLSA does not provide overtime protections to workers who
drive a truck over 10,000 pounds GVW.   29 U.S.C. § 213(b)(1); 49 U.S.C. § 13102.  Based on
the named plaintiffs' extensive knowledge and experience working with IOs in Massachusetts
and Connecticut, however, they believe that all IOs earn more than minimum wage and drive
trucks over 10,000 pounds.  In any event, the Notice advises class members about their rights
under the FLSA, so they will be alerted to this issue.

damages.  According to BFBD, the damages for any IO would be limited to damages under the wage laws, and because each IO has received at least minimum wages, there are no wage violations.  Both Massachusetts and Connecticut have overtime exemptions for employees driving trucks over 10,000 GVW, and Plaintiffs know of no IOs who drive trucks under that limit, so there are no claims for overtime wages.  Moreover, even for an IO operating a "small truck," there would be additional exemption defenses available to Defendant.  Plaintiffs contend that misclassified IOs would be entitled to recover at least some expenses that they incur in the course of their work, but there is no clear precedent about what expenses are recoverable.  Other forms of theoretical harm – such as having to pay the employer's share of payroll taxes – may be harms of a type that cannot be remedied in this action.  For example, an IO's remedy for misclassification under the Internal Revenue Code is arguably not through a private right of action, but through an administrative proceeding at the Internal Revenue Service.  See, e.g., Umland v. PLANCO Financial Services, Inc., 542 F.3d 59, 64-65 (3d Cir. 2008) (no private right of action for payroll taxes paid by alleged employee as a result of misclassification).

Fifth, there are substantial risks regarding the maintenance of this case as a class action through trial.  Although Plaintiffs plainly believe that class treatment is warranted, class certification is often the most vigorously contested issue in these cases.  Plaintiffs have the burden of proving the four prerequisites of Fed. R. Civ. P. 23(a) (numerosity, commonality, typicality, and adequacy), as well as the two prerequisites of Rule 23(b)(3) (predominance and superiority).  As has been widely recognized, the risk of not obtaining class certification in federal court has become significantly greater following the U.S. Supreme Court's decision in -Mart Stores, Inc. v. Dukes, ___ U.S. ___, 131 S.Ct. 2541 (2011).

Sixth, Plaintiffs believe that BFBD could satisfy a greater judgment.  But there is a related concern that is of potential greater significance to IOs.  If Plaintiffs succeed in their claim, it would fatally undermine BFBD's central business model.  There is considerable uncertainty about what structural changes BFBD would make in that event.  At the very least, there is a risk that if BFBD were forced to treat IOs as employees rather than contractors then BFBD would exert greater control over IOs, make changes that reduce their earnings, or make other changes that would result in long-term harm to IOs.

Seventh, the relationship of the size of the settlement fund to possible recoveries is difficult, if not impossible, to evaluate given the uncertain measure of damages.  If IOs were entitled to recover every expense they incurred – an unlikely result – then each IO would stand to recover thousands or tens of thousands of dollars, but the amount would vary based on each IO's individual circumstances, an analysis that would impose significant burdens on IOs, counsel, and the Court.  Even by the measure of potential damages, the amount that current IOs stand to receive from the settlement is reasonable given the risks involved.

One important factor in this case that is not directly covered by the Grinnell factors – which focus on economic considerations – is the extent to which the settlement provides benefits to IOs in addition to their settlement shares.  The dispute resolution procedures provide for lower-cost mechanisms for IOs to address issues with BFBD.  And the strengthening of the Association provides IOs with a stronger voice in their dealings with BFBD.  These provisions of the agreement – which were included at the express request of IOs – allow IOs to continue enjoying the benefit of operating their own businesses while addressing their fundamental concerns of powerlessness.

**2.      The proposed payments to the named plaintiffs are fair and reasonable.**

The Court need not make a final ruling on the named plaintiffs' payments until the time of final approval (when it can assess any objections), but the proposed payments to the named plaintiffs are intended to compensate them for the substantial time, effort, and risk associated with their role in initiating and driving the negotiation process over the past two years.  These IOs have spent dozens of hours in the connection with negotiation process, as illustrated by the Affidavit of Wayne Anderson, attached as Exhibit 5

These proposed payments are reasonable relative to incentive awards made in other cases.  See, e.g., Trujillo v. City of Ontario, 2009 WL 2632723,*5 (C.D. Cal. 2009) (approving $10,000 and $30,000 incentive payments for sixteen named plaintiffs); Hughes v. Microsoft Corp., 2001 WL 34089697, *13 (W.D. Wash. 2001) (approving $25,000 incentive payments to named plaintiffs); Ingram v. The Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding $300,000 to each of four representative plaintiffs); Presley v. Carter Hawley Hale Profit Sharing Plan, 2000 WL 16437, at *2 (N.D. Cal. 2000) (approving $25,000 incentive payments to each of the two named plaintiffs); In re Dun & Bradstreet Credit Servs. Customer Litig., 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) (citing cases in support of enhancement payments and awarding payments ranging from $35,000 to $50,000 for named plaintiffs); Yap v. Sumintomo Corp. of Am., 1991 WL 29112, *9 (S.D.N.Y. 1991) (awarding $30,000 additional compensation to representative plaintiffs).

**3.      Plaintiffs' counsel should be appointed as class counsel and the proposed fee should be preliminary approved as reasonable.**

Pursuant to Fed. R. Civ. P. 23(g), a court should consider the following criteria when appointing class counsel.

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).

The three firms representing the Plaintiffs are highly qualified in class action and wage-and-hour litigation.  The attorneys at Lichten & Liss-Riordan ("LLR") have represented thousands of employees in well more than fifty class action cases, in both state and federal court. They have brought four wage-and-hour or other employment class actions to trial, prevailing in all on behalf of the plaintiffs.[7]  The firm's attorneys also have obtained significant favorable appellate and trial court rulings in a number of wage-and-hour class cases.[8]  In addition to these

---

[7]    See Calcagno v. High Country Investor, Inc., d/b/a Hilltop Steak House, Civil Action No. 03-0707 (Essex Super. Ct., July 25, 2006) (plaintiffs' jury verdict); Benoit v. The Federalist, Inc., Civil Action No. 04-3516 (Suffolk Super. Ct., Dec. 7, 2007) (plaintiffs' jury verdict); DiFiore v. American Airlines, Inc., Civil Action No. 07-10070-WJY (D.Mass., Apr. 7, 2008) (plaintiffs' jury verdict), aff'd 454 Mass. 486 (2009), rev'd on federal preemption grounds, 646 F.3d 81 (1st Cir. 2011); Bradley v. City of Lynn, 443 F. Supp. 2d 145 (D.Mass. 2006) (plaintiffs' verdict on class action race discrimination case).

[8]    See, e.g., Awuah v. Coverall North America, Inc., 460 Mass. 484 (2011) (holding that, under the Massachusetts wage laws, cleaning workers could recover the "franchise fees" they had paid, as well as deductions taken from their pay for insurance and workers compensation; declaring it to be a violation of public policy for worker to be required to buy a job); Bednark v. Catania Hospitality Group, Inc., 78 Mass. App. Ct. 806 (2011) (reversing summary judgment in favor of employer, limiting reach of employer safe harbor provision in Tips Law); Awuah v. Coverall North America, Inc., 707 F. Supp. 2d 80 (D.Mass. 2010) (holding that janitorial "franchisees" were misclassified as independent contractors); Somers v. Converged Access, Inc., 454 Mass. 582 (2009) (ruling that employer cannot take credit for additional wages allegedly paid on account of independent contractor classification); DiFiore v. American Airlines, Inc., 454 Mass. 486 (2009) (upholding jury verdict for skycaps based on strict application of Tips Law), rev'd on other grounds, 646 F.3d 81 (1st Cir. 2011); Cooney v. Compass Group Foodservice, 69 Mass. App. Ct. 632, 639 (2007) (ruling that Tips Law is to be interpreted strictly

favorable rulings, LLR has obtained dozens of court-approved settlements in class action wage-and-hour cases. This experience has led numerous courts to conclude, at the class certification stage and in connection with proposed class settlements, that the firm's attorneys are adequate representatives in Massachusetts and national class actions.

Since 1919, Pullman & Comley LLC has provided substantial legal services to thousands of clients in Connecticut and nationally.  The firm's attorneys in the litigation and labor & employment departments have tried countless cases to verdict and litigated those cases through appeals to the Connecticut Supreme Court and various circuit courts of appeals.  With regard to labor & employment matters in Connecticut and the circuit circuits alone, for over seventeen years, Pullman & Comley attorneys have been involved with several class actions and significant multi-party actions including, Biediger v. Quinnipiac Univ., 616 F. Supp. 2d 277 (2009); Medeika v. SNET (D. Conn. 3:97-cv-01123-TPS), and Gismondi v. United Tech. Corp., 408 F.3d 295 (2005).   More recently, attorney Daniel Schwartz successfully handled the landmark employment decision in Schumann v. Dianon Systems, 304 Conn. 585 (2012) which set the parameters for free speech in the private workplace in Connecticut for the first time.

The Law Offices of Richard Hayber, based in Hartford, Connecticut has extensive experience in labor and employment matters in Connecticut and surrounding states, including substantial experience with class actions.  His firm has been counsel for plaintiffs in dozens of wage-and-hour class and collective actions for the last twelve years.  He has obtained many

---

against companies, and any charge called a "service charge" must be distributed to waitstaff under the statute); Skirchak v. Dynamics Research Corp., 508 F.3d 49 (1st Cir. 2007) (invalidating class action waiver in arbitration clause); Smith v. Winter Place LLC d/b/a Locke-Ober Co., Inc., 447 Mass. 363 (2006) (ruling that internal complaints of wage violations are protected under anti-retaliation statute).

multi-million dollar settlements in these cases.  Wage and hour class actions make up approximately 50% of his practice.  See Affidavit of Richard E. Hayber, attached as Exhibit 6.

The Court need not make a final ruling on fees until the time of final approval (when it can assess any objections), but the proposed award of fees is reasonable.  To date, Plaintiffs' counsel has spent a total of over 590 hours, representing fees in an amount of over $230,000.  Affidavit of Stephen Churchill, attached as Exhibit 7, at ¶ 4; Affidavit of Daniel Schwartz, attached as Exhibit 8, at ¶ 6.  Plaintiffs' counsel expects to spend considerably more time with the settlement approval and administration process.[9]  Churchill Aff., Exhibit 7, at ¶ 6.  In addition, Plaintiffs' attorneys have advanced over $10,000 in expenses, principally for mediator fees.  Churchill Aff,, Exhibit 7, at 5.

The proposed fees of 25 percent are substantially less than the usual and customary practice of setting contingency fees at one-third of any recovery.  Indeed, the named Plaintiffs signed retainer agreements providing for a one-third contingency arrangement.  At the time these retainers were signed, Plaintiffs' counsel was taking a substantial risk by agreeing to pursue a class action with no assurance that they would recover any fees.  And, in fact, Plaintiffs' counsel has already spent considerable time and expense on this case.

Courts frequently favor an award of fees from a common fund, as called for by the proposed settlement in this case.  As the Supreme Court has explained:

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole. . . .  Jurisdiction over the fund involved in the litigation allows a Court to prevent . . . inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

---

[9]     One of the Plaintiffs' law firms, LLR, has substantial experience administering class settlements and proposes to administer this settlement, if approved by the Court.  This in-house administration will avoid the unnecessary expense of third-party administration.

Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980) (citations omitted).  See also Blum v. Stenson, 465 U.S 886, 900 n.16 (1984).

When awarding fees from a common fund, the "percentage of the fund" method has been recognized as advantageous depending on the circumstances, because it is less burdensome to administer than the lodestar method.  Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 48-49 (2d Cir. 2000).  In addition, the percentage method is result-oriented, and therefore promotes a more efficient use of attorney time – a loadstar method may give attorneys an incentive to spend as many hours as possible on the litigation and may discourage early settlements.  Id.[10]  When using the percent of the fund method, an award of 25 percent is within the usual range.  See, e.g., Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1272 (D.C. Cir. 1993) (reviewing cases and concluding that "a majority of common fund class action fee awards fall between twenty and thirty percent").

An award of 25 percent of the fund is consistent with the vital role that contingency arrangements play in making legal counsel available to individuals who cannot afford hourly fees.  Unlike traditional firms that receive hourly fees on a monthly basis, plaintiffs' counsel who take cases on contingency often spend years litigating cases (typically while incurring significant out-of-pocket expenses for experts, transcripts, travel, etc.), without receiving any ongoing payment for their work.  Sometimes fees and expenses are recovered; other times, despite

---

[10]    Even though the loadstar analysis is not necessary, Goldberger, 209 F.3d at 49-50 ("we see no need to compel district courts to undertake the 'cumbersome, enervating, and often surrealistic process' of lodestar computation") (citations omitted), a loadstar analysis in this case further demonstrates that the proposed award for fees and costs is fair and reasonable.  See id. at 50 (noting that loadstar method can be used to "cross check" the reasonableness of a fee).  Here, the total lodestar fees exceed $230,000 and costs already exceed $10,000.  Thus, awarding 25 percent of the settlement for fees and expenses would result in a multiplier of only about 3.6.

hundreds of hours of work, nothing is recovered.  This type of practice is viable only if attorneys, having received nothing for their work on some cases, receive more in other cases than they would if they charged hourly fees.  Courts have long recognized this reality.  See, e.g., Hensley v. Eckerhart, 461 U.S. 424, 448 (1983) (noting that "[a]ttorneys who take cases on contingency, thus deferring payment of their fees until the case has ended and taking upon themselves the risk that they will receive no payment at all, generally receive far more in winning cases than they would if they charged an hourly rate");  re Union Carbide Corp. Consumer Products Business Securities Litigation,  F. Supp. 160, 168 (S.D.N.Y. 1989) ("Contingent fee arrangements implicitly recognize the risk factor in litigation and that the winning cases must help pay for the losing ones if a lawyer who represents impecunious plaintiffs, or those plaintiffs not so fully committed as to put their own money where their mouth is, will remain solvent and available to serve the public interest.")  By permitting clients to obtain attorneys without having to pay hourly fees, this system provides critical access to the courts for people who otherwise would not be able to find competent counsel to represent them.  That access is particularly important for the effective enforcement of public protection statutes, such as the wage laws at issue in this case.  It is well recognized that "private suits provide a significant supplement to the limited resources available to [government enforcement agencies] for enforcing [public protection] laws and deterring violations." Reiter v. Sonotone Corp., 442 U.S. 330, 344 (1979).

**4.      The court should preliminarily certify a settlement class.**

Plaintiffs propose a settlement class that includes all IOs who purchased products at depots in Connecticut and Massachusetts from January 1, 2008 (pursuant to the parties' tolling agreement) through the date of preliminary approval of the proposed settlement.  Plaintiffs assert that this class meets all of the requirements for class certification at this stage for settlement

purposes.  See Newberg § 11.27 ("When the court has not yet entered a formal order determining

that the action may be maintained as a class action, the parties may stipulate that it be maintained

as a class action for the purpose of settlement only"); County of Suffolk v. Long Island Lighting

Co., 710 F. Supp. 1422, 1424 (E.D.N.Y. 1989), aff'd in part, rev'd in part on other grounds, 907

F.2d 1295 (2d Cir. 1990).  Preliminary certification for purposes of settlement has well-

recognized practical purposes, including the issuance of notice to class members and

implementation of a global settlement.  See In re GMC Pick-Up Truck Fuel Tank Prods. Liab.

Litig., 55 F.3d 768, 790-92 (3d Cir. 1995) (outlining reasons for preliminary class certification

for settlement); Dorn v. Eddington Sec., Inc., 2011 WL 382200, at *1 (S.D.N.Y. Jan. 21, 2011)

(same).

        In the Second Circuit, courts have concluded that "Rule 23 is given liberal rather than

restrictive construction, and courts are to adopt a standard of flexibility" in evaluating class

certification.  Reade-Alvarez v. Eltman, Eltman & Cooper, P.C., 237 F.R.D. 26, 31 (E.D.N.Y.

2006), quoting Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997).  Plaintiffs assert that

preliminary certification is warranted here, because Plaintiffs satisfy all of the class certification

requirements.

        Plaintiffs assert that they satisfy the four requirements of Fed. R. Civ. P. 23(a), which

include numerosity, commonality, typicality, and adequacy.  *First*, the proposed class includes

about 433 IOs, which plainly exceeds what is necessary to establish numerosity depending on the

circumstances.  See Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)

("numerosity is presumed at a level of 40 members").  *Second*, Plaintiffs assert that the

commonality requirement is satisfied, because this case relates to BFBD's claimed uniform

policy of classifying IOs as independent contractors.  See Port Auth. Police Benevolent Ass'n,

Inc. v. Port Authority of N.Y. & N.J., 698 F.2d 150, 153-54 (2d Cir. 1983) (to satisfy

commonality requirement, claims need only share common questions of fact or law); Khait v.

Whirlpool Corp., 2009 WL 6490085, *2 (E.D.N.Y. Oct. 1, 2009) (commonality requirement

satisfied where common issues include employer's classification of employees). *Third*, Plaintiffs

assert that the claims of the seven named Plaintiffs meet the typicality requirement, which courts

have found to be satisfied "when each class member's claim arises from the same course of

events, and each class member makes similar legal arguments to prove the defendant's

liability." Marisol A., 126 F.3d at 376 (internal quotation marks and citation

omitted). See also Trinidad v. Breakaway Courier Sys., Inc., 2007 WL 103073, at *6 (S.D.N.Y.

Jan. 12, 2007) (typicality is evaluated "with reference to the company's actions, not with respect

to particularized defenses it might have against certain class members") (internal quotation

marks and citation omitted). *Fourth*, the named plaintiffs and their counsel assert that they "will

fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). See also Toure

v. Cent. Parking Sys., 2007 WL 2872455, at *7 (S.D.N.Y. Sep. 28, 2007) ("The adequacy

requirement exists to ensure that the named representative will 'have an interest in vigorously

pursuing the claims of the class, and…have no interests antagonistic to the interests of other class

members.'"), quoting Penney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006).  The

seven named plaintiffs have demonstrated through their commitment and leadership as Board

members of the Association that they are capable of representing the interests of IOs, and they

assert that their interests here are aligned with those of all IOs.  Likewise, Plaintiffs' counsel, as

discussed above, is highly experienced both in employment litigation and in class action

litigation.  Indeed, Plaintiffs' counsel has been recognized as adequate counsel in dozens of class

action cases.  See, e.g., Overka v. American Airlines, 2010 WL 517407, *3 (D.Mass. Feb. 4,

2010) (Lichten & Liss-Riordan "is well qualified and experienced in class actions on behalf of employees"); <u>Scott v. Aetna Servs., Inc.</u>, 210 F.R.D. 261, 267 (D.Conn. 2002) (finding Hayber Law Firm and other plaintiffs' counsel "experienced and competent in class action litigation, employment litigation, and wage-and-hour litigation in particular").

Plaintiffs also assert that they satisfy the two requirements of Fed. R. Civ. P. 23(b)(3): predominance and superiority.  Indeed, satisfaction of the four criteria of Fed. R. Civ. P. 23(a) "goes a long way toward satisfying the Rule 23(b)(3) requirement of commonality."  <u>Rossini v. Ogilvy & Mather, Inc.</u>, 798 F.2d 590, 598 (2d Cir. 1986).  These requirements focus on "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 623 (1997).  On the issue of predominance, plaintiffs must demonstrate that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole…predominate over those issues that are subject only to individualized proof." <u>Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.</u>, 502 F.3d 91, 107-108 (2d Cir. 2007) (internal quotation marks and citation omitted).  In misclassification cases, many courts have found this requirement to be satisfied.  <u>See</u>, <u>e.g.</u>, <u>Cruz v. Hook-Superx, LLC</u>, 2010 WL 3069558, at *3 (S.D.N.Y. Aug. 5, 2010) ("Plaintiffs' allegation is simple and identical across all claims: Defendants have misclassified employees to escape overtime wage obligations."); <u>Clark v. Ecolab, Inc.</u>, 2009 WL 6615729, at *5 (S.D.N.Y. Nov. 27, 2009) (common factual allegations and common legal theory predominated over individual variations among class members in settlement of misclassification case); <u>Iglesias-Mendoza v. La Belle Farm, Inc.</u>, 239 F.R.D. 363, 373 (S.D.N.Y. 2007) (issue of whether employees were entitled to overtime – another misclassification issue – is "about the most perfect question[] for class treatment.").

With respect to superiority, there is no dispute that, for purposes of this settlement, a class action is the most effective means of resolving this dispute.  See Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968) (superiority requirement examines whether "the class action device [is] superior to other methods available for a fair and efficient adjudication of the controversy"). Factors relevant to the issue of superiority include class members' interests in individually controlling the prosecution or defense of separate actions; whether individual class members wish to bring, or have already brought, individual actions; and the desirability of concentrating the litigation of the claims in the particular forum.  Fed. R. Civ. P. 23(b)(3).  To Plaintiffs' knowledge, no other IOs purchasing product from BFBD in Massachusetts or Connecticut have initiated lawsuits against BFBD, which indicates that other IOs do not have a demonstrated interest in pursuing individual actions.  On the contrary, the 40-plus IOs who executed retainers with Plaintiffs' counsel did so with the expectation of pursuing a class action rather than individual actions.  Moreover, because the proposed class is focused on Connecticut and Massachusetts, it would be appropriate and desirable to concentrate the litigation of class members' claims in this Court.  The Court need not assess for settlement the manageability requirement of the superiority prong of Federal Rule 23(b)(3) because there will be no trial due to the settlement.  Amchem, 521 U.S. at 620.

**5.     The Court should approve the content and proposed distribution of the notice.**

The proposed Notice fully complies with requirements of Fed. R. Civ. P. 23(c)(2)(B), which requires notices issued in a Rule 23(b)(3) class action to include the following information:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).  Plaintiffs' counsel has structured the notice to conform to these requirements, and also have included additional information to ensure that class members fully understand the background and context of the proposed settlement.

If approved, LLR will send the proposed Notice by first-class mail to the last known addresses of all IOs who have purchased product from BFBD at depots in Massachusetts or Connecticut at any time between January 1, 2008 to the date of the Court's preliminary approval of the proposed settlement.  BFBD already has provided class-member contact information to Plaintiffs' counsel.  To the extent any mailings are returned as undeliverable, LLR will use appropriate databases to skip-trace outdated addresses, and will promptly resend the notices and claim forms to those updated addresses.  To ensure that all claims members receive notice and have an opportunity to submit claim forms, LLR will send two rounds of notice.  The first notice would be sent immediately upon this Court's preliminary approval of the settlement.  The second, reminder notice will be sent approximately one month later.

## Conclusion

For these reasons, Plaintiffs respectfully request that the Court preliminarily certify a class for settlement purposes, preliminarily approve the proposed class settlement, appoint the undersigned as class counsel, and approve issuance of the proposed notice, all as set forth in the proposed order attached as Exhibit 1.

ERIC AHLQUIST, WAYNE ANDERSON,
JEREMY SOUZA, WILLIAM BENNETT,
RICHARD JAMES, EDWARD
GIACOMAZZO, JR., MATTEO
NACLERIO, on behalf of themselves and all others
similarly situated,


/s/ Stephen Churchill
Harold Lichten (ct02440)
Stephen Churchill (phv04506)
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street – Floor
Boston, MA  02114
(617) 994-5800
 @llrlaw.
 @llrlaw.

Daniel A. Schwartz (ct15823)
Pullman & Comley, LLC
90 State House Square
Hartford, CT 06103
860-424-4359 phone
860-424-4370  fax
 @pullcom.

Richard E. Hayber (ct11629)
Hayber Law Firm, LLC
Employee Rights Advocates
221 Main Street
Hartford, CT  06106
(860) 522-8888
 @hayberlawfirm.


Dated:  November 19, 2012

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on November 19, 2012, a true and correct copy of the foregoing document entitled PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

<u>/s/ Stephen Churchill</u>
Harold Lichten (ct02440)
Stephen Churchill (phv04506)
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street –  Floor
Boston, MA  02114
(617) 994-5800
@llrlaw.com
@llrlaw.com